**Henry W. SKINNER, Appellant,**

v.

**The STATE of Texas.**

No. 74400.

Court of Criminal Appeals of Texas.

Dec. 10, 2003.

Steven C. Losch, Longview and Douglas G. Robinson, Washington, D.C., for Appellant.

Richard J. Roach, DA, Pampa, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

PRICE, J., delivered the opinion of the Court.

Our prior opinion is withdrawn.

The appellant was convicted of capital murder and sentenced to death pursuant to Texas Penal Code Section 19.03(a)(7)(A) and Texas Code of Criminal Procedure Article 37.071, Section 2(g). This Court affirmed the appellant's conviction on direct appeal. *Skinner v. Texas*, 956 S.W.2d 532 (Tex.Crim.App.1997). The appellant filed a motion with the trial court for DNA testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure. The trial court denied the motion but failed to enter determinations under Article 64.03 of the Texas Code of Criminal Procedure. The appellant appealed the denial of the motion to this Court. The motion was remanded to the trial court with directions to enter an order containing the relevant Article 64.03 determinations. Then, the trial court entered the order finding that the appellant did not satisfy the requirements of Article 64.03(a)(2)(A) and 64.03(a)(2)(B).[1]

The appellant appeals the denial of the motion. The appellant asserts that the trial court 1) erroneously denied his mo-

---

1. Although appellant invokes the statutory language of Article 64.01 in his brief, the trial court did not enter any findings regarding Article 64.01. As a result, we presume the trial court found that appellant met that article. Therefore, there is no adverse finding to appeal under Article 64.01.

tion for DNA testing and 2) violated the principles of appellate review by failing to provide meaningful Chapter 64 findings. We affirm.

### Facts

Around midnight on December 31, 1993, Twila Busby and her two sons, Elwin and Randy Caler, were murdered in the home they shared with the appellant. The appellant was found around 3 a.m. in the home of Andrea Reed, dressed in clothing that was covered in the blood of two of the victims. The State collected evidence from the crime scene, the autopsies of the victims, and the appellant's personal effects. This evidence included the clothing worn by the appellant, blood evidence from the crime scene, fingerprints, a bloody knife, a plastic bag containing a knife and what appeared to be a cup towel stained with a blood-like substance, a bloody axe handle, a rape kit from the female victim, fingernail clippings from the female victim, and hair evidence from the victims.

The State did not subject all of this evidence to forensic testing. Although the State tested the blood on the appellant's clothing, blood and hair from a blanket that partially covered one of the victims, and hairs on one of the victim's back and cheeks, they did not test the knives, axe handle, rape kit, fingernail clippings, or other hair samples. The State also tested fingerprint evidence. The bloody palm prints in a bedroom where one of the victims was killed and on doorknobs in the house matched the appellant's prints, but one set of fingerprints on a bag containing one of the knives did not match those of the appellant.

At trial, defense counsel presented the theory that the appellant was unconscious due to intoxication when the murders were

committed. Defense counsel further argued that the prosecution failed to uphold its burden of proof beyond a reasonable doubt by not testing pieces of evidence, including the alleged murder weapons, for DNA evidence. Defense counsel also introduced a series of exculpating theories— evidence of the appellant's intoxication level during the time of the murders, the appellant's hand injury, and another potential perpetrator of the crime, Robert Donnell, a relative of the victims. The jury heard expert testimony about the appellant's physical abilities on the night of the murders from a toxicologist and from an occupational therapist who specialized in hand therapy. In addition, the jury heard testimony that Donnell pursued Busby in the hours prior to the murder, was known to carry a knife, and had been violent with women before. Finally, the jury heard testimony about the State's failure to test each piece of evidence the appellant now wishes to test.

Following the appellant's conviction, Professor David Protess from the Medill School of Journalism at Northwestern University in Chicago urged the State to have the items tested. The State sent much of the State's evidence to GeneScreen, a private forensics lab in Dallas, for analysis. This testing was conducted before the enactment of Chapter 64.[2] GeneScreen tested hair and fiber samples from Busby, hair from the axe handle, and bloodstains from the crime scene. However, some evidence remained untested and unreported. GeneScreen did not report tests of the fingernail clippings and rape kit, though they were part of the evidence sent by the State. In addition, the State did not send GeneScreen the two knives and the jacket with blood and hair, all recovered from the

---

**2.** Chapter 64 was signed into law in April of 2001. The District Attorney sent forensic evidence to GeneScreen for testing in July of 2000.

crime scene. As a result, the appellant filed a motion to test the two knives found at the crime scene, the cup towel containing what appeared to be a blood-like substance, the rape kit, fingernail clippings from Busby, hair from the jacket recovered from the crime scene, and fingerprint evidence from the plastic bag containing one of the knives.

*Analysis*

■ The appellant alleges that the trial court erred in determining that the appellant had not met his burden under Article 64.03(a)(2)(A) and 64.03(a)(2)(B). Article 64.03(a)(2)(B) requires the appellant to demonstrate by a preponderance of the evidence that the DNA testing request is not made to unreasonably delay the execution of his sentence or the administration of justice. The appellant does not have a set date of execution, and he has a federal habeas appeal pending. The testing could be conducted before the appellant is assigned an execution date or appears on his federal habeas claim. In this case, we find that the trial court's determination was an abuse of discretion that is not supported by the record. Accordingly, we overrule the trial court's 64.03(a)(2)(B) determination.

■ Article 64.03(a)(2)(A) requires the convicted individual to establish by a preponderance of the evidence that a reasonable probability exists that he or she would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing. This court has interpreted that language as meaning a reasonable probability exists that exculpatory DNA tests will prove a convicted individual's innocence. *Kutzner v. State*, 75 S.W.3d 427, 438 (Tex.Crim.App.2002). We have reaffirmed the use of this standard in other cases. *See Bell v. State*, 90 S.W.3d 301 (Tex.Crim.App.2002); *Rivera v. State*, 89 S.W.3d 55 (Tex.Crim.App.2002). After reviewing the evidence, we find that the record supports the trial court's conclusion that the appellant failed to meet this standard.

The appellant wishes to test DNA evidence from the two knives found at the scene, the rape kit from Busby, the blood-like substance on a cup towel found at the scene, blood from under Busby's fingernails, and hair and blood from a jacket found in the house. Assuming *arguendo* that each piece of evidence was to provide negative results for the appellant, he still does not meet the *Kutzner* standard because DNA evidence from the previous GeneScreen tests was inculpatory.

The GeneScreen reports indicate that Twila and the appellant "are included as contributors to the mixed profile from the hair from the right hand of Twila Busby." This analysis demonstrates the intermingling of the victim's and the appellant's DNA, probably during the time when she was struggling for her life. Because the appellant's DNA was found mixed with Busby's DNA in her right hand during the autopsy, there is nothing about the other items found at the crime scene that, if linked to a third person, would cast doubt on the appellant's presence at the scene of Busby's death or the appellant's involvement in the offense. Given this evidence and the other evidence detailed above, the presence of a third party's DNA at the crime scene would not constitute affirmative evidence of innocence. *See Bell*, 90 S.W.3d at 306. The standard required by this Court to grant testing under Chapter 64 is affirmative evidence of innocence. *Kutzner*, 75 S.W.3d at 438–439. Thus, the trial court properly concluded that the appellant failed to meet the requirements of 64.03(a)(2)(A).

■ As part of his 64.03(a)(2)(A) claim, the appellant further argues that the trial

court erred in not compelling: 1) the production of benchnotes[3] from the GeneScreen lab and 2) the comparison of the fingerprint evidence collected from the trash bag containing one of the potential murder weapons with the fingerprints of Donnell, another potential perpetrator.

In this case, personnel from the Tarrant County Medical Examiners office, Roche Laboratories and GeneScreen may have prepared benchnotes. The appellant does not know if such benchnotes exist, nor does he cite any authority for compelling this production. Instead, the appellant claims the GeneScreen reports are ambiguous. He urges this Court to order production of the benchnotes for clarification. The four GeneScreen reports present in the record clearly state the results from testing in a conclusion paragraph. Although the reports do not chronicle tests for every piece of evidence, the report from October 2, 2000, states "Twila Busby and Henry Watkins Skinner are included as contributors to the mixed profile from the hair from the right hand of Twila Busby." We think the report is unambiguous, and without more, we will not compel the clinic to turn over its notes.

■ Additionally, the appellant argues that the trial court erred in not compelling the State to compare the fingerprint[4] found on the black plastic bag with the known prints of the other possible perpetrator defense counsel raised at trial, Donnell.[5] In *Kutzner*, this Court said that the language and legislative history of 64.03(a)(2)(A) do not contemplate the trial court's consideration of new post-trial information. *Kutzner*, 75 S.W.3d at 439. In *Kutzner*, we assumed, without deciding, that Article 64.03(a)(2)(A) would allow the trial court to consider new information. *Ibid.* We concluded that the new information that Kutzner provided in his motion for DNA testing did not undermine the trial court's 64.03(a)(2)(A) finding because ample evidence existed in the record that defeated the claim that a reasonable probability existed that Kutzner would not have been prosecuted or convicted if the DNA results were exculpatory. Similarly, the appellant's request to compare the fingerprint evidence would not provide a reasonable probability of the appellant's innocence, but instead would only demonstrate the presence of a third party. As such, the new information would not undermine the trial court's 64.03(a)(2)(A) finding. Therefore, the trial court was correct in denying the appellant's request for fingerprint testing.

■ Finally, the appellant contends that the trial court's failure to provide specific findings undermines the structure of the statute. The trial judge denied the appellant's Chapter 64 motion and found that the appellant failed to meet the standards required by 64.03(a)(2)(A) and 64.03(a)(2)(B). Although the trial court should provide determinations under the statute, this court has *de novo* review of application-of-law-to-fact issues that do not depend on the credibility and demeanor of witnesses. *Rivera v. State*, 89 S.W.3d 55, 59 (Tex.Crim.App.2002).

---

**3.** Laboratory technicians create benchnotes, which thoroughly track the collection, testing, and handling of the evidence. In addition, benchnotes may contain the technician's preliminary notes and findings. The amount of detail provided in the notes vary amongst the labs, but the information contained within them is used to create the final lab report.

**4.** Chapter 64 deals with the testing of forensic DNA evidence. Fingerprint evidence is not covered.

**5.** Although Donnell is now deceased, his prints are on file due to his criminal record.

Article 64.03(a)(2)(A) requires a petitioner to demonstrate, by a preponderance of the evidence, that a reasonable probability exists that he or she would not have been prosecuted or convicted if exculpatory results were obtained through DNA testing. This Court has interpreted 64.03(a)(2)(A) to require a reasonable probability that exculpatory DNA tests would prove the petitioner's innocence. *Kutzner*, 75 S.W.3d at 439. This Court further established that, "[T]he ultimate question of whether a reasonable probability exists that exculpatory DNA tests would prove innocence is an application-of-law-to-fact question that does not turn on credibility and demeanor and is therefore reviewed *de novo.*" *Rivera*, 89 S.W.3d at 59. Similarly, the Article 64.03(a)(2)(B) question of whether the request for DNA testing is made to unreasonably delay the execution of sentencing or the administration of justice is an application-of-law-to-fact question and is therefore given *de novo* review.

The trial court's findings, when considered with the record in this case, are sufficient for the purposes of our review.[6] The trial court found that the appellant failed to meet the requirements of 64.03(a)(2)(A) and 64.03(a)(2)(B). This may not be adequate in every case, and this Court would appreciate more detailed findings from the trial court to facilitate our review. But, in appellant's case, the record supports the trial court's conclusion that the appellant did not prove by a preponderance of the evidence that a reasonable probability existed that he would not have been prosecuted or convicted if the DNA test results were exculpatory.

Because we find the appellant failed to meet the burden under Article 64.03(a)(2)(A), we affirm the trial court's decision to deny the motion for testing under Chapter 64.

---

**6.** The appellant's request for DNA testing under Chapter 64 includes affidavits from two trial witnesses that do turn on credibility and demeanor and therefore should be determined by the trial court. The trial court did not make a determination on the credibility of these affidavits. Because the inculpatory GeneScreen testing precludes the appellant from meeting the *Kutzner* standard, the trial court's findings on the affidavits are immaterial to the resolution of appellant's Article 64.03(a)(2)(A) claim. Even if the trial court found the affidavits to be compelling, the appellant fails to surpass the *Kutzner* standard of affirmative evidence of innocence.